# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN BRUCE ZEESE,<br>MARGARET ANN FLOWERS,<br>ADRIENNE PINE, and<br>DAVID VERNON PAUL,<br><br>    Defendants. | Criminal Action No. 19-169 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

The defendants, Kevin Bruce Zeese, Margaret Ann Flowers, Adrienne Pine, and David Vernon Paul, are charged with a single misdemeanor count of interference with certain protective functions of the United States Department of State, in violation of 18 U.S.C. § 118. *See* Information (May 17, 2019), ECF No. 14. The charges arise from events that took place at the Embassy of Venezuela in Washington, D.C., between May 13 and May 16, 2019. *See id.*; *see also* Motion *in Limine* to Limit Argument, Testimony and Evidence ("Gov't MIL") at 4, ECF No. 83. The government contends that, on May 13, agents from the Department of State's Diplomatic Security Service ("DSS") informed the defendants, who were inside the Embassy, that they were trespassing and directed them to leave. *See* Joint Pretrial Statement ("JPTS") at 5, ECF No. 84. On May 16, the defendants, who were still in the Embassy, were arrested, and the government alleges that, by not leaving when told to do so by DSS agents, the defendants engaged in the charged criminal conduct. *Id.*

Pending is the government's motion *in limine* to limit the scope of argument, testimony and evidence offered at the defendants' trial, *see* Gov't MIL at 1, which is scheduled to begin

on February 11, 2020, *see* Minute Entry (Oct. 23, 2020).  The government seeks to exclude evidence or argument about 14 subjects, which the government has divided into three categories: (1) U.S. policy toward Venezuela and the defendants' views about that policy, *see* Gov't's MIL at 2–3; (2) actions of the defendants prior to the May 13 to May 16 timeframe charged in the information, *see id.* at 3; and (3) four potential defenses, *id.* at 3–4.  As outlined below, defendants oppose the government's motion *in limine* as to most, but not all, of the 14 subjects. *See* Rough PTC Hr'g Tr. (Jan. 29, 2020) at 86:3–107:17; *see also* Defs.' Opp'n to Gov't's Mot. *in Limine* to Limit, Argument, Testimony, and Evidence ("Defs.' Opp'n") at 1–2, ECF No. 88 (joined by all defendants); Def. Flowers' Supplemental Resp. in Opp'n to Gov't's Mot. *in Limine* ("Flowers' Opp'n") at 17–18, ECF No. 89.  For the reasons explained below, the government's motion is granted in part and denied in part.

## I.     BACKGROUND

The government has proffered the following facts as underlying the instant charge against each defendant.  In January 2019, President Donald Trump recognized Juan Guaidó as Interim President of Venezuela, and Guaidó subsequently notified President Trump that Carlos Vecchio had been appointed Ambassador to the United States.  Aff. in Support of Criminal Compl. and Arrest Warrant ("Gov't's Aff.") ¶¶ 5–9, ECF No. 1-1.  The defendants, along with others who supported the regime of Nicolás Maduro in Venezuela, began inhabiting the Venezuelan Embassy in Washington in April of 2019.  *See* Gov't Aff. ¶ 12.  In late April 2019, Vecchio sent official diplomatic correspondence to the State Department requesting the support of the U.S. government for the Guaidó regime's efforts to retake the Embassy from the Maduro supporters inhabiting it.  *Id.* ¶ 16.

In the evening on May 13, 2019, DSS agents posted on the property of the Embassy copies of a notice, *id.* ¶¶ 23–25, that stated: (1) the United States "recognizes" Vecchio "as the

representative[] of Venezuela with lawful control over the property;" (2) "[t]he United States does not recognize the authority of the former Maduro regime, or any of its former representatives, to allow any individuals to lawfully enter, remain on the property, or take any other action with respect to this property;" (3) Vecchio has requested that those on the property leave and not return absent the ambassador's "express authorization;" (4) "individuals with law enforcement powers are requesting and directing anyone who is on this property to depart from it immediately;" and (5) "[a]ny person who refuses to comply with these requests and orders to depart from this property will be trespassing in violation of federal and District of Columbia law and may be arrested and criminally prosecuted," Defs.' Mot. to Compel Production of Discovery and *Brady* Material in the Custody of the Government ("Defs.' Mot. to Compel"), Ex. B, Trespassing Notice ("DSS Notice"), ECF No. 70-2. The same notice was also read via loudspeaker by law enforcement. Gov't Aff. ¶ 29.

Later the same night, members of the District of Columbia Fire Department cut chain locks and a bicycle lock from the main entrance to the Embassy using hydraulic bolt cutters. *Id.* ¶ 30. DSS agents then opened the door, read the notice aloud, and left copies of the notice on the ground near the Embassy entrance. *Id.* ¶ 32. According to the government, the defendants did not leave the Embassy on May 13. *Id.* ¶ 32. The defendants were arrested on May 16, 2019 at the Embassy. *See* JPTS at 5.

The defendants were charged the next day in a one count information, *see* Information (May 17, 2019), ECF No. 14, with violating 18 U.S.C. § 118. That provision states, in pertinent part:

> Any person who knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged, within the United States . . . , in the performance of the protective functions authorized under section 37 of the State Department Basic

> Authorities Act of 1956 (22 U.S.C. § 2709) or section 103 of the
> Diplomatic Security Act (22 U.S.C. § 4802) shall be fined under this
> title, imprisoned not more than 1 year, or both.

18 U.S.C. § 118. Section 37 of the State Department Basic Authorities Act of 1956, *see* 22 U.S.C. § 2709, and § 103 of the Diplomatic Security Act, *see* 22 U.S.C. § 4802, define certain protective functions of the State Department, including "maintaining the security and safety of . . . foreign missions . . . within the United States," 22 U.S.C. § 2709(a)(3). The parties agree that the elements of the charged offense are: (1) the defendant obstructed, resisted, or interfered with a federal law enforcement agent; (2) at the time the defendant obstructed, resisted, or interfered, the federal law enforcement agent was engaged, within the United States, in the performance of any of the protective functions authorized under 22 U.S.C. § 2709 or 22 U.S.C. § 4802; and (3) the defendant acted knowingly and willfully. *See* JPTS at 22.

Following voluminous discovery, including 900 videos and 30,000 pages of documents, *see* Discovery Hr'g Tr. (Dec. 13, 2019) at 24:9–10, ECF No. 82, and the denial of defendant's motion to compel, *see id.* at 44:8–10 (explaining orally reasons for denial of defendants' motion to compel), the parties filed pretrial motions and presented arguments on those motions at the pretrial conference on January 29, 2020.[1] The only outstanding motion is the government's motion *in limine*, which, as described, seeks to exclude evidence or argument about 14 subjects. The government argues that the enumerated subjects are irrelevant and should thus be excluded under Federal Rule of Evidence 402. Gov't's MIL at 6–7. Even if the information is relevant, the government presses that "the Court should nonetheless exclude" it under Federal Rule of

---

[1] At the pretrial conference, seven other pretrial motions were resolved orally. *See* Minute Order (Jan. 29, 2020) (denying Flowers' Request for Hearing, Motion to Adopt other Defendants' Motions, Request for Notice of the Government's Intent to Use Evidence, Motion for Leave to File Pretrial Motions, Motion to Sever, and Motion to Dismiss on First Amendment grounds, *see* Def. Flowers' Pretrial Mots., Incorporated Mem. of Law, and Request for Hr'g, ("Def. Flowers' Mots"), ECF No. 85, and granting in part and denying in part Flowers' Motion for Additional Peremptory Challenges, *see id.*).

4

Evidence 403, "as its probative value is substantially outweighed by its prejudicial effect" or its danger of confusing the jury. *Id.* at 7. The defendants counter that many of the topics the government seeks to exclude are relevant to explain "why they did not vacate the Embassy," Defs.' Opp'n at 4, which is "probative of whether they acted willfully," *id.* at 5.

## II.     LEGAL STANDARD

As the Supreme Court has recognized, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Pretrial motions *in limine* effectuate the directive, embodied in Federal Rule of Evidence 103(d), that "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." FED. R. EVID. 103(d). Pretrial motions *in limine* also further the general purpose of the Rules of Evidence to administer the proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102. To this end, "[a] pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations." *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

## III.    DISCUSSION

Following brief review of the applicable Federal Rules of Evidence, the three categories of information the government seeks to exclude are considered in reverse order, starting with the potential defenses, then the topics related to the period before May 13, 2019 and, finally, the information about U.S. policy toward Venezuela.

### A.     Overview of Applicable Evidentiary Rules

Evidence is relevant, under the definition found in Rule 401, if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of

consequence in determining the action." FED. R. EVID. 401. Under Rule 402, "[i]rrelevant evidence is not admissible," but relevant evidence generally is. FED. R. EVID. 402. One exception to Rule 402's general rule of admissibility of relevant evidence is Rule 403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. In a criminal case, a defendant's constitutional right to present a defense extends only to relevant evidence and even relevant evidence may be subject to reasonable restrictions on admissibility, such as those found in Rule 403. *See Rock v. Arkansas*, 483 U.S. 44, 55 (1987) ("Of course, the right to present relevant testimony is not without limitation.").

"[T]he burden is on the introducing party to establish relevancy," *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990), as well as admissibility under other evidentiary rules. Further, "[i]n deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008); *see also United States v. Abel,* 469 U.S. 45, 54 (1984) ("Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

With these principles in mind, the admissibility of the potential defenses is considered first.

### B.     Potential Defenses

The government seeks exclusion of four defenses the defendants may try to assert: (1) "a *bona fide* belief defense based on the fact that the defendants had a right to remain in the Embassy based on the conduct or actions of the Maduro regime," Gov't' MIL at 3; (2) any

defense asserting that the defendants were acting within their First Amendment speech or association rights; (3) (a) any argument that the DSS Notice was legally invalid or based on improper legal authority, and (b) in particular, any argument or defense that the DSS Notice was legally deficient due to a lack of letterhead, signature, or official seal; and (4) any defense asserting that the defendants were acting properly on the advice of counsel by refusing to leave the embassy, *id.* at 3–4. The government contends that these arguments are "irrelevant" and that they are not "legally cognizable defenses" in this case. Gov't Reply to Defs.' Opp'ns to its Mot. *in Limine* to Limit Testimony and Evidence ("Gov't Reply") at 7, ECF No. 90.

As to the second and fourth of these defenses, all four defendants have clarified that they will not seek to offer an advice of counsel defense. *See* Rough PTC Hr'g Tr. at 86:8–10 (Flowers' counsel); *id.* at 100:16 (Paul's counsel); *id.* at 103: 19–24 (Pine's counsel); *id.* at 104:14–15 (Zeese's counsel).[2] Three of the defendants have indicated they do not plan to assert any First Amendment–based defense. *See id.* at 97:7 (Paul's counsel); *id.* at 103: 19–24 (Pine's counsel); *id.* at 104:14–15 (Zeese's counsel).[3] Given the defendants' representations that they

---

[2] As to the possibility of an advice of counsel defense, the defendants were advised at the pretrial conference that raising such a defense would likely result in "waiving attorney-client privilege . . . with respect to whatever communications they had with that counsel." Rough PTC Hr'g Tr. at 100:3–8; *see also United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) ("Reliance on advice-of-counsel is an affirmative defense" that "waive[s] the [attorney-client] privilege"). If defendants were to seek to offer an advice of counsel defense, they would have to provide a proper foundation for its assertion. *See United States v. West*, 392 F.3d 450, 457 (D.C. Cir. 2004) ("A defendant may avail himself of an advice of counsel defense only where he makes a complete disclosure to counsel, seeks advice as to the legality of the contemplated action, is advised that the action is legal, and relies on that advice in good faith."). Moreover, the scope of any testimony and evidence about the advice of counsel would be limited by principles of relevance and probative value discussed throughout this decision: defendants would be permitted with an advice of counsel defense to argue that the advice of their attorney gave them a good faith basis to believe that remaining in the Embassy was not unlawful even after law enforcement ordered them to leave, but would not be permitted to argue based on the advice of counsel that Maduro was the rightful leader of Venezuela or that the Guaidó regime was illegitimate and lacked authority to operate the Venezuelan government or Embassy. *See supra* Part III.B; *supra* Part III.D.

[3] Flowers' motion to dismiss the information under the First Amendment, *see* Def. Flowers' Mots. at 1–5, was denied at the pretrial conference because the First Amendment provides no legal basis for objecting to the charge in the information, *see* Rough PTC Hr'g Tr. at 69–70. Later in the hearing, Flowers' counsel stated that Flowers would raise the topics identified in the government's motion were the government to open the door to those topics. *See* Rough PTC Hr'g Tr. at 86:8–10 (Flowers' counsel). Were Flowers, or any other defendant, to seek to raise a First Amendment defense at trial, presentation of such a defense to the factfinder would be precluded by the

7

will not seek to offer such evidence, the government's motion to exclude evidence, argument, and testimony about potential defenses predicated on the First Amendment and on advice of counsel is granted.

All the defendants argue, however, that aspects of the other two defenses the government seeks to exclude — a *bona fide* belief defense and an argument that the DSS Notice rested on invalid legal authority — are relevant "to the *mens rea* element of the offense." Defs.' Opp'n at 4. As to these two remaining potential defenses, the government's motion will be granted in part and denied in part. The scope of evidence and argument allowed on these defenses is determined by the case law defining the applicable *mens rea* — knowingly and willfully — and so the discussion begins with an overview of that law and the parties' diverging views, as reflected in their proposed jury instructions. *See* JPTS at 73–74; Defs.' Proposed Jury Instruction on "Willfully" and Sources of Authority, ECF No. 97.

### 1. *Knowingly and Willfully*

Section 118 penalizes "[a]ny person who *knowingly and willfully* obstructs, resists, or interferes with a Federal law enforcement agent engaged" in certain protective functions of the State Department. 18 U.S.C. § 118 (emphasis added). The parties agree that "[a]n act is done 'knowingly' if it is done voluntarily and intentionally and not because of mistake or accident." JPTS at 72 (quoting S1 Modern Federal Jury Instructions-Criminal 2.15 (2019)); *see also*, *e.g.*, *Bryan v. United States*, 524 U.S. 184, 193 (1998) ("[T]he term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.").

---

Court's legal conclusion in denying the motion to dismiss that § 118 is constitutional as applied to the defendants. *See, e.g.*, *United States v. Matthews*, 209 F.3d 338, 341 n.1 (4th Cir. 2000) (stating that defendants' ability to raise his First Amendment defense to the jury rises and falls with his as-applied First Amendment challenge to the charge).

"Willfully," on the other hand, "is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan*, 524 U.S. at 191 (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *see also United States v. Murdock*, 290 U.S. 389, 394 (1933) (collecting cases and definitions). Generally, "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan*, 524 U.S. at 191–92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). The "conduct" that "the jury must find the defendants to have willfully done [i]s the *actus reus* that violated" § 118. *United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir. 2019). The government and the defendants thus agree that establishing a willful violation of 18 U.S.C. § 118 here requires proof that defendants knew that it was unlawful for them to remain in the Embassy after DSS agents had ordered them to leave.

Defendants argue that a more particularized showing is required, objecting to the inclusion of the following sentence in the government's proposed instructions to the jury on willfully: "'Willfully' does not require proof that the Defendant knew of the existence and meaning of the statute making his or her conduct criminal." JPTS at 73 (quoting S1 Modern Federal Jury Instructions-Criminal 5.05 (2019)); *see* Rough PTC Hr'g Tr. at 54:22–25 (Paul's counsel objecting to this sentence); Rough PTC Hr'g Tr. at 55:8–10 (Paul's counsel stating that "it's problematic . . . that [defendants] don't have to know of the existence and meaning of the statute when" they were told they were trespassing and were later charged with interference with the protective functions). That sentence, however, correctly encapsulates the proof required here. The Supreme Court "has required proof that a defendant know which law he was breaking in only two contexts: criminal tax evasion, and currency structuring." *Burden*, 934 F.3d at 690–91 (discussing *Ratzlaf*, 510 U.S. 135 and *Cheek v. United States*, 489 U.S. 192, 206 (1991)).

Those contexts involve 'highly technical statutes and present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan*, 524 U.S. at 194.

Plainly, this is not such a context: 18 U.S.C. § 118 is not highly complex, and the risk that a statute prohibiting disobeying the orders of law enforcement will criminalize otherwise innocent behavior is low, as the duty to obey law enforcement is a common sense one. *See Bryan*, 524 U.S. at 194–95 (distinguishing the tax and currency structuring statutes from a statute about unlicensed firearm dealing for these reasons); *United States v. Rawlings*, 982 F.2d 590, 593 (D.C. Cir. 1993) (distinguishing distributing of controlled substances from the contexts in which heightened *mens rea* is required); *United States v. George*, 386 F.3d 383, 394 (2d Cir. 2004) ("Unlike the currency structuring statute at issue in *Ratzlaf*, [18 U.S.C. § 1542] does not risk criminalizing otherwise innocent conduct because knowingly submitting false information in a passport application is not innocent behavior.").

Thus, here, to prove willfulness, the government need only prove that defendants knew that the charged conduct — remaining in the Embassy after being told by DSS agents to leave — was unlawful. As the Supreme Court hinted in *Bryan*, in some cases, the government may be able to satisfy this element of the offense by relying on the "traditional rule that ignorance of the law is no excuse." 524 U.S. at 196. Carrying the willfulness burden in other cases, however, will require the government to "negat[e] a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good faith belief that he was not violating the law." *Cheek*, 489 U.S. at 206; *see also United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985) (holding that good faith is a defense to willfully filing false statements under 18 U.S.C. § 1001).

Critically, such claims of good faith mistake or ignorance about the law are analytically distinct from claims contesting the validity of the legal duties at issue. *See, e.g.*, *United States v. Platte*, 401 F.3d 1176, 1185 (10th Cir. 2005) ("*Cheek* drew a sharp distinction between a mistake of law negating willfulness and a studied disagreement with the law."). Even in prosecutions, such as those for criminal tax violations, involving a heightened willfulness *mens rea*, "a defendant's views about the validity of the" applicable laws "are irrelevant to the issue of willfulness and need not be heard by the jury and, if they are, an instruction to disregard them would be proper." *Cheek*, 489 U.S. at 206; *see also, e.g.*, *United States v. Hunter*, 554 F. App'x 5, 8 (D.C. Cir. 2014) ("A defendant's views about the validity of the relevant statutes . . . are 'irrelevant to the issue of willfulness.'" (quoting *Cheek*, 489 U.S. at 206)). In *Cheek*, which involved charges of willfully failing to file federal income tax returns and willfully evading payment of income taxes, the defendant sought to argue "that he should be acquitted because he believed in good faith that the income tax law is unconstitutional as applied to him and thus could not legally impose any duty on him of which he should be aware." 489 U.S. at 205. These beliefs, the Supreme Court held, were irrelevant to willfulness because they "do not arise from innocent mistakes" about the substance of the law but "[r]ather . . . reveal full knowledge of the provisions at issue and a studied conclusion, however wrong, that those provisions are invalid." *Id.* Put differently, arguments contesting the validity of applicable legal duties are irrelevant to willfulness because such arguments assert not that defendants were unaware of and lacked intent to violate those legal duties but assert instead that defendants, having full knowledge of the applicable legal duties, disagree with them. Evidence of "simple disagreement with known legal duties" does not negate the government's proof of willfulness. *Id.* at 204.

The key line dividing relevant from irrelevant defenses to the government's proof of willfulness, then, is this: arguments about the defendants lacking knowledge that their conduct was unlawful are relevant to the issue of willfulness; arguments that contest the validity of the legal duties at issue are irrelevant to the issue of willfulness. This principle is now applied to the two potential defenses contested in the government's motion *in limine*.

### 2. Bona Fide *Belief Defense*

The *bona fide* belief defense exists in trespassing, or unlawful entry, cases, where the prosecution must prove unlawful entry and a defendant may cast reasonable doubt on that proof by claiming that the entry was made "with a good purpose and a *bona fide* belief in [the] . . . right to enter." *Darab v. United States*, 623 A.2d 127, 136 (D.C. 1993) (citing *Smith v. United States*, 281 A.2d 438, 439 (D.C.1971)). Defendants charged with unlawful entry under the D.C. Code and permitted to raise a *bona fide* belief defense are further entitled to a jury instruction "to the effect that the government must prove beyond a reasonable doubt that the defendant did not have a reasonable, good faith belief in his lawful authority to stay." *Id.* (stating that such an instruction is required when the defendant's belief is "genuinely questionable"). The charge here is not trespassing, however. Thus, the government has no burden to prove unlawful entry and the defendants need not be given an opportunity to rebut such proof by raising a traditional *bona fide* belief defense. The government's motion to exclude any *bona fide* belief defense is granted to that extent.[4]

---

[4]     This conclusion is consistent with the Court's explanation at the December hearing denying the defendants' motion to compel discovery from the government of any information in the government's possession indicating "that defendants were lawfully present in the Embassy and/or that they believed they were lawfully present in the Embassy." Defs.' Mot. to Compel at 9; *see also* Discovery Hr'g Tr. at 34:6–8 (Court stating, "this is not a state law trespassing case, and so there is no possibility of the defense raising a *bona fide* belief defense."). Since the December hearing, the defendants have clarified, as explained in the next paragraph of text, that they are not seeking to raise a traditional *bona fide* belief defense.

Indeed, the defendants recognize the incongruity between the elements of the charged offense and the traditional *bona fide* belief defense. *See* Rough PTC Hr'g Tr. at 96:10–12 (Paul's counsel acknowledging that the defendants would not "characterize" any defense they seek to raise as a *bona fide* belief defense); *id.* at 104:16–25 (Zeese's counsel making similar point).[5] Defendants thus do not dispute that they should not be permitted to raise a formal *bona fide* belief defense but instead say that they are entitled to present a somewhat similar defense based on their belief that their continued presence in the Embassy during the charged three days, May 13 to May 16, 2019, was not unlawful.[6] The admissibility of this similar defense is a more complicated question.

As the defendants emphasized at the pretrial conference, the basis for the instant charges is an allegation that the defendants defied the DSS Notice and DSS agents' oral orders to leave the Embassy, which notice and orders expressly referenced that the defendants were trespassing. *See* Rough PTC Hr'g Tr. at 96:17–97:3. Given this, the defendants argue that "they should have the right to explain why they believe they were not trespassing; particularly in a case like this,

---

[5] To elaborate on the mismatch between the state-law bona fide belief defense and 18 U.S.C. § 118, in a trespassing case, the government must prove unlawful entry, so a defendant's bare assertion of a good faith belief in having lawfully entered negates an element of the government's case. In contrast, here, the assertion that defendants believed they were lawfully in the Embassy only becomes relevant when presented in a particular context — that is, as a piece of the argument that, because they believed they were lawfully present, they did not know the DSS Notice and orders, and the legal duty to obey those orders, pertained to them. Further, under D.C. law, "[a] bona fide belief must have some justification — some reasonable basis," *Darab*, 623 A.2d at 136 (quoting *Smith*, 281 A.2d at 439), a requirement incompatible with *Cheek*, which held that good-faith defenses to willfulness requirements do not have a reasonableness element, *see Cheek*, 498 U.S. at 203. Finally, under D.C. law, a bona fide belief "must be based in the pure indicia of innocence" — that is, "[t]here must be some evidence that, for example, the individual had no reason to know that he was trespassing on the rights of others," *Darab*, 623 A.2d at 136 (quoting *Gaetano v. United States*, 406 A.2d 1291, 1294 (D.C. 1979)). Evidence about the DSS Notice and orders likely negates such innocence here.

[6] Paul's counsel primarily advanced this argument, *see* Rough PTC Hr'g Tr. at 96:10–16, and was joined by Pine and Zeese's counsel, *see* Rough PTC Hr'g Tr. at 103: 19–24 (Pine's counsel); *id.* at 104:16–25 (Zeese's counsel). Flowers' counsel stated at the hearing that Flowers would only seek to present evidence on this topic, and on every topic the government seeks to exclude, "if the government opened the door." Rough PTC Hr'g Tr. at 86:9. In light of Flowers' argument, in opposing the government's motion, that the government's "proposed voir dire, jury instructions and the Government's exhibit list" indeed opened this door, Flowers' Opp'n at 17–18, the Court infers that Flowers, like the other defendants, would indeed seek to offer some form of this defense.

where there is willfulness as an element of the crime" and the government "has to show the defendants believed what they were doing was unlawful." *Id.* at 98:10–14. Put slightly differently, the defendants argue that, given the trespass-related conclusion embedded in the DSS agents' notice and oral orders, the defendants "should be able to . . . present their evidence as to why they believed they were not trespassing" to explain "their reaction to" the DSS agents' orders and to argue that "they did not form the required *mens rea* to commit the offense; namely, that they did not believe they were violating a known legal duty." *Id.* at 99:10–16. In other words, the defendants "were told" by DSS agents that they were trespassing, but the defendants "felt — having been given the keys by the departing Venezuelan diplomats" and having "agreed to try to protect the property from some of the people outside" — "that they were lawfully allowed to do that." *Id.* at 106:6–11. The belief about what "they were lawfully allowed to" do, defendants claim, goes to whether they knew that the charged conduct of remaining in the Embassy after the DSS orders to leave was unlawful. *Id.* at 106:12–19.

The defendants' belief about having permission from the Maduro regime to occupy the Embassy is relevant and admissible for the purpose of supporting the argument that defendants did not know that the DSS Notice and oral orders applied to them and that remaining in the Embassy after the DSS agents' orders to leave was unlawful.[7] To break this down further, defendants are permitted to present evidence about their understanding that they had been given permission by the Maduro regime to be in the Embassy. Such evidence may be used for the purpose of arguing they did not know that the DSS agents' orders applied to them and that, as a result, they did not know that their defiance of the orders was unlawful.[8]

---

[7]     Admission of this evidence and argument does not import any of the D.C. law governing the *bona fide* belief defense, for the reasons explained *supra* note 5.

[8]     This conclusion does not affect the earlier ruling that defendants are not entitled to discovery from the government of all information in the government's possession indicating "that defendants . . . believed they were

As will be explained in detail below, in presenting this evidence and these arguments, the defendants will be permitted to introduce their subjective belief that Maduro was the leader of Venezuela with control over the Embassy and will be permitted to offer evidence that they had "been given the keys by the departing Venezuelan diplomats" associated with Maduro. The defendants will not be permitted to assert that Maduro was indeed the leader of Venezuela because that assertion, which goes to the validity of the DSS agents' orders and which questions the President's exclusive power to recognize foreign governments, is irrelevant and contrary to law. An appropriate instruction on this point, if requested, may be given. Further, the defendants will not be permitted to introduce any agreement "to try to protect the property," as any such agreement is irrelevant to rebutting the government's case for *mens rea* or any other element of the offense.

The allowed defense based on the defendants' belief that they had permission from the Maduro regime to inhabit the Venezuelan Embassy is akin to one recognized by the Supreme Court in *Cheek*, where the defendant was permitted to present evidence of his "understanding that" the relevant tax laws did not apply to him — that is, "within the meaning of the tax laws, he was not a person required to file a return or to pay income taxes." 498 U.S. at 203.[9] There, the Supreme Court explained, "[o]f course, in deciding whether to credit Cheek's good-faith belief

_____

lawfully present in the Embassy." Defs.' Mot. to Compel at 9. The defendants' request was comprised of seven sub-requests and, as explained orally, each sub-request was denied as "inappropriate," Discovery Hr'g Tr. at 34:23, prohibited by Federal Rule of Criminal Procedure 16(a)(2), *id.* 35:14, "unsuitably broad," *id.* at 35:20, or deniable "for lack of any of the requested documents," *id.* 36:11; *see also id.* 37:7–8.

[9] The statutes in *Cheek*, as explained, required heightened proof of willfulness, but this mistake-of-law defense is still relevant here, where only a general, not a statute-specific, awareness of the illegality of the *actus reus* is required. One court of appeals has "doubt[ed] whether the *Cheek* mistake-of-law defense would apply to" statutes like the ones here and in *Bryan* with *mens rea* of willfulness that are "hardly part of a complex regulatory scheme." *United States v. Platte*, 401 F.3d 1176, 1186 (10th Cir. 2005) (addressing 18 U.S.C. § 2155(a), which prohibits "willfully" damaging national defense material). Although the Supreme Court did not address this question in *Bryan*, if *Bryan*'s rule that willfulness requires the government to establish "that the defendant acted with knowledge that his conduct was unlawful" is to have force, defendants must be able to introduce mistake-of-law evidence to rebut any presumption that reasonable citizens know the law. 524 U.S. at 192.

claim, the jury would be free to consider any admissible evidence . . . showing that Cheek was aware of his duty to file a return and to treat wages as income, including . . . contents of the personal income tax return forms and accompanying instructions that made it plain that wages should be returned as income." *Cheek*, 489 U.S. at 202.

Similarly, here, the jury will be free to consider evidence showing that the defendants knew that remaining in the Embassy was unlawful, including the detailed text of the DSS Notice and the multiple ways and occasions law enforcement presented that notice to the defendants. Contrary to the government's suggestion at the pretrial conference, the existence of such evidence does not make the defendant's subjective belief that they were lawfully present in the Embassy irrelevant. *See* Rough PTC Hr'g Tr. at 110:4–12. Instead, such evidence goes to whether the defendants' subjective belief should be "credit[ed]," an issue for the jury to evaluate, no matter how "incredible" the defendants' "misunderstandings of and beliefs about the law might be." 498 U.S. at 203. "Of course," as the Supreme Court put it in *Cheek*, "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties . . . and will find that the Government has carried its burden of proving" *mens rea*. 498 U.S. at 203–04. Here, a defense that defendants were unaware of the unlawfulness of defying an order of law enforcement likely faces an uphill battle with a jury: not only is the legal duty to obey law enforcement orders straightforward and widely known, but also, here, there is evidence that the notice personally delivered by law enforcement spelled out how failure to comply with the orders to leave the Embassy premises would violate federal law and could lead to arrest and prosecution.

In summary, the government's request to exclude "a *bona fide* belief defense based on the fact that the defendants had a right to remain in the Embassy based on the conduct or actions of the Maduro regime," Gov't' MIL at 3, is granted in part and denied in part. A traditional *bona fide* belief defense will not be permitted, but defendants will be permitted to introduce evidence about their subjective belief that they "had a right to remain in the Embassy based on the conduct or actions of the Maduro regime." *Id.* As will be discussed, defendants will not be permitted to cast that belief as a "fact" about their "right to remain," *id.*, as such an argument would irrelevantly contest the validity of the legal duties at issue.

### 3. Arguments about the DSS Notice

The government's request to exclude any argument that the notice posted and read by law enforcement was legally invalid or based on improper legal authority, and any argument or defense that the DSS Notice was legally deficient due to a lack of letterhead, signature, or official seal, *id.*, is also granted in part and denied in part.

#### a. Argument that the DSS Notice was Legally Invalid or Based on Improper Legal Authority

The defendants maintain that "why they believed the trespassing notice was invalid" is relevant to rebutting the willfulness element of the offense. Defs.' Opp'n at 4; *see also* Rough PTC Hr'g Tr. at 97:13–16 (Paul's counsel stating, "We are seeking and believe we have the right, under the Constitution, to present evidence as to their understanding and belief as to the lawfulness and legitimacy of the order that was given.").[10] As already explained, however, the Supreme Court and the D.C. Circuit have been crystal clear that "[a] defendant's views about the validity of the relevant" legal duties "are 'irrelevant to the issue of willfulness.'" *Hunter*, 554 F.

---

[10] Again, Pine and Zeese's counsel unequivocally joined this statement at the hearing. *See* Rough PTC Hr'g Tr. at. at 103: 19–24 (Pine's counsel); *id.* at 104:14–15 (Zeese's counsel). The Court infers that Flowers, like the other defendants, would seek to offer some form of this defense. *See infra* note 6.

App'x at 8 (quoting *Cheek*, 489 U.S. at 206). As those courts have explained, to negate willfulness, a defense must suggest that defendants were unaware that their conduct was unlawful. A defendant's claim that the applicable legal duties are invalid, however, suggests that the defendant knew about the legal duties, thought about the legal duties, and formed an opinion about those legal duties. Considered disagreement with a legal duty embodied in the criminal law is not a defense to a charged criminal violation, even where the *mens rea* of the offense is willfulness.

The defendants are precluded from arguing that law enforcement's notice was legally invalid or based on improper legal authority. This prohibition includes, as will be discussed further below, assertions that Guaidó and members of his administration lacked authority over the Embassy and therefore could not tell the State Department who could and could not be in the Embassy, contentions that Maduro was the rightful leader with authority over the Embassy, and arguments that the United States' recognition of Guaidó was somehow improper, deficient, or incomplete.

Barring the defendants from presenting this defense does not amount to "a directed verdict on the willfulness element," Rough PTC Hr'g Tr. at 102:14, or to "proceeding on the erroneous assumption that Defendants are charged with a strict liability offense," Defs.' Opp'n at 4. Defendants are frequently prohibited from contesting before a jury the validity of the laws or legal duties underlying a criminal charge, with *Cheek* illustrating just one example. Another is *United States v. Platte*, in which defendants charged with "willfully" damaging "national defense material," 18 U.S.C. § 2155(a), at a U.S. Air Force missile site were not entitled to argue "that they believed that the operations at the missile site violated treaties and other international laws so that their actions were legally justifiable," 401 F.3d at 1185. This amounted to an argument

that "§ 2155(a) is invalid (as contrary to treaties and international law)," and "such a claim of invalidity cannot create a" legitimate defense "under *Cheek*." *Id.* The defendants' "recourse," the Tenth Circuit said, would not be an argument to the jury but "would be to show in this court the invalidity of § 2155(a) in light of treaties and other international law." *Id.*[11]

In arguing that precluding argument about the DSS Notice's legal validity would treat the instant charge as a strict liability offense, defendants liken this case to *United States v. Sheehan*, 512 F.3d 621 (D.C. Cir. 2008). *See* Defs.' Opp'n at 3–4. In *Sheehan*, a defendant charged with violating certain permitting requirements was erroneously precluded from offering at trial any *mens rea* evidence, including evidence showing that she could not hear or understand announcements to leave the area. 512 F.3d at 633. This case is not like *Sheehan*. The government rightly acknowledges that it could not object to a similar defense here — one contending that the defendants did not know or understand that they were being ordered to leave the Embassy premises. *See* Gov't's Reply at 4 n.4. At the same time, the government rightly distinguishes such a defense from an irrelevant argument that those orders, while known, could be disobeyed because they were legally invalid.

---

[11]    The government points to several cases in which defendants charged with interfering with federal officials were precluded from disputing before a jury the validity of the federal officials' actions or orders. *See* Gov't's Reply at 7–9 (citing, among other cases, *United States v. Brown*, 669 F.3d 10, 19–20 (1st Cir. 2012); *United States v. Johnson*, 462 F.2d 423, 427–28 (3d Cir. 1972)). Defendants point out that *Brown* and *Johnson* involve 18 U.S.C. § 111, which penalizes any person who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" certain federal officers "while engaged in or on account of the performance of official duties." *See* Rough PTC Hr'g Tr. at 114:15–115:22. "Forcibly" is a lesser standard of *mens rea* than "knowingly and willfully," so the defendants argue that cases about 18 U.S.C. § 111 are wholly inapposite here. *See id.* Cases like *Cheek* and *Platte* involving statutes with a *mens rea* of willfulness and deeming irrelevant defendants' arguments about the invalidity of the legal duties at issue show that the outcomes in *Brown* and *Johnson* would not change were the relevant *mens rea* in 18 U.S.C. § 111 willfulness. Cases like *Brown* and *Johnson* are still instructive here insofar as they touch on Congress's general purpose in enacting statutes prohibiting interference with federal officers, like 18 U.S.C. § 118 and § 111. As the Third Circuit put it in *Johnson*, Congress aimed "to provide federal officers the protection of federal courts when such officers are performing their duties. This purpose is not achieved where individuals are at liberty to resist federal officers in the performance of their duties because of a difference of opinion, whether real or imagined." 462 F.2d at 427.

In sum, then, the defendants are precluded by Rule 402's bar on irrelevant evidence from contesting the validity or lawfulness of the orders given by law enforcement and embodied in the DSS Notice.

b.     *Argument that the DSS Notice was Deficient Due to Lack of Letterhead, Signature, or Official Seal*

The government also moves to exclude "any argument or defense that the trespassing notice was legally deficient due to a lack of letterhead, signature, or official seal." Gov't's MIL at 3–4. Consistent with the rulings and legal principles just outlined, the defendants will not be permitted to argue that formal features of the DSS Notice made it legally invalid. Such an argument is as irrelevant as the argument that the substance of the DSS Notice made it legally invalid.

At the same time, the defendants will be permitted to argue that they did not know that the charged conduct — remaining in the Embassy despite law enforcement orders to vacate the Embassy — was unlawful because they did not appreciate that the DSS Notice was authentic due to some formal insufficiency in the notice or its delivery. More specifically, defendants may present the fact that the DSS Notice was not on letterhead, was not signed, and had no official seal. The defendants may argue that those features of the notice affected their interpretation of the notice and thus prevented them from forming the requisite knowledge and willfulness to interfere with the DSS agents.

\*       \*       \*

In sum, the government's motion is granted in part and denied in part as to the defenses: (1) defendants are not permitted to raise a traditional *bona fide* belief defense but are permitted to contest that they were unaware that their remaining in the Embassy was unlawful based on their subjective belief that they had been given permission by the Maduro regime to be in the

Embassy; (2) any defense asserting that the defendants were acting within their First Amendment speech or association rights is excluded as irrelevant; (3) (a) any argument that the DSS Notice posted and read by law enforcement was legally invalid or based on improper legal authority is excluded as irrelevant, and (b) any argument or defense that the DSS Notice was legally invalid due to a lack of letterhead, signature, or official seal is excluded as irrelevant, but the defendants are permitted to argue that they did not know that the charged conduct was unlawful due to their subjective belief about the lack of authenticity of the DSS Notice; and (4) defendants have clarified that they will not seek to offer any defense asserting that the defendants were acting properly on the advice of counsel by refusing to leave the embassy, *id.* at 3–4, but were such a defense offered, it would be limited as outlined *infra* note 2.

### C. Actions of the Defendants Prior to May 13

The next category includes the following three subjects: (1) any cooperation between the defendants or those associated with them and law enforcement in the weeks before May 13, 2019; (2) any "incidents, altercations, or disagreements" between the defendants or those associated with them and other protestors at the Venezuelan Embassy; and (3) the access to food, water, or electricity inside the Embassy in the weeks before the defendants were arrested. *See* Gov't's Mot. at 3.

As to the first point, the relevance of any cooperation — if any did occur — was addressed at the December hearing on the defendants' motion to compel discovery. The Court ruled then that evidence of purported cooperation between the defendants and law enforcement before the dates referenced in the information — May 13 to 16, 2019 — was irrelevant to rebutting the government's case in chief or to establishing any defenses. *See* Discovery Hr'g Tr. at 30:4–9. Nothing has changed. In opposing the government's motion *in limine*, the defendants have renewed their earlier argument that evidence of "how they cooperated with law

enforcement during their time at the Embassy" is relevant to *mens rea*. Defs.' Opp'n at 4. As was explained earlier, "[h]aving previously tried to keep rival protesters out of the Embassy" or having otherwise cooperated with law enforcement in protecting the Embassy "does not tend to refute the defendants'" knowledge or willfulness in refusing "to comply with directions from DSS agents to vacate the premises of the Embassy *during the period* covered in the criminal charge and identified in the information." Discovery Hr'g Tr. at 30:4–9 (emphasis added).

At the pretrial conference on January 29, the defendants clarified that they will not seek to offer information in sub-categories two and three. Rough PTC Hr'g Tr. at 86:8–10 (Flowers' counsel); *id.* at 94:19–23 (Paul's counsel); *id.* at 103: 19–24 (Pine's counsel); *id.* at 104:14–15 (Zeese's counsel). In any event, neither topic is relevant, as showing that defendants interacted with others in or surrounding the Embassy or that defendants lacked food, water, or electricity does not tend to refute any element of the offense. Introduction of evidence about conflicts or difficulties defendants may have had with rival protestors or with electricity, food, and water access also runs a risk of distracting, confusing, or even prejudicing the jury.

Thus, the government's motion *in limine* is granted as to the category of actions taken prior to the timeframe charged in the information.

### D. U.S. Policy toward Venezuela and the Defendants' Views about that Policy

The government seeks to exclude seven topics under the umbrella of U.S. policy about Venezuela and defendants' opinions thereon. Those topics are: (1) the legitimacy or legality of Juan Guaidó or any member of his administration as representing the government of Venezuela; (2) the merits of the Guaidó administration as compared to those of the Maduro regime; (3) personal opinions regarding the political, social, or economic situation in Venezuela; (4) the need for a protecting power agreement allowing a third country to take control of the Venezuelan mission and Embassy in the United States, *see* Rough PTC Hr'g Tr. at 83:5–17 (explaining a

protecting power agreement); (5) the Vienna Convention and its applicability to the facts of this case; (6) the United States government's recognition, formally or informally, of Nicolas Maduro or any members of his regime; and (7) the Guaidó administration's authority and capacity to operate the Venezuelan government or Embassy, Gov't's MIL at 2–3.

The defendants have clarified that they will not put forward evidence or arguments about the merits of the Guaidó administration or about the political, social, or economic situation in Venezuela. Such evidence about world affairs would be irrelevant in any event.

As to the remaining five subjects, the defendants maintain that their views that the Guaidó regime was illegitimate and lacked authority to operate the Venezuelan government or Embassy, that the United States maintained some relationship with Maduro, that a protecting power agreement covering the Embassy should be brokered, and that the Vienna Convention allowed for the brokering of a protecting power agreement are relevant to "why" the defendants "did not leave the Embassy," which, in turn, is relevant to defendants' *mens rea*. Defs.' Opp'n at 5; *see also* Rough PTC Hr'g Tr. at 90:15–19 (connecting the Vienna Convention).

Arguments that the Guaidó administration is illegitimate are versions of the defense, excluded above as irrelevant, that the federal agents' orders to leave the Embassy were legally invalid because they relied on Guaidó's authority over the Embassy. Additionally, as explained in detail at the hearing in December, this case must proceed on the factual premise that President Trump recognized Guaidó as the leader of Venezuela and on the legal premise that the President's recognition power is exclusive. *See* Discovery Hr'g Tr. at 38:14–41:24. Neither that legal or that factual premise may be questioned by a court or impeached before a jury. *See id.*; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2096 (2015).[12] Thus, the

---

[12] For this reason, the defendants' request for information in the government's possession reflecting the defendants' understanding that "individuals and agencies within the US government made statements and took

government's motion is granted as to the topics of "the legitimacy or legality of Juan Guaidó . . . as representing the government of Venezuela," Gov't's MIL at 2; "the Guaidó administration's authority and capacity to operate the Venezuelan government or Embassy;" and the United States' continued relationship with Maduro or any members of his regime, *id.* at 3.

Defendants argue that their hopes that a protecting power agreement would be brokered under international law, including the Vienna Convention, provide "context for why they were there." Rough PTC Hr'g Tr. at 89:8. In the defendants' view, such information completes the story about the permission they received from Maduro's departing diplomats to remain in the Embassy because it explains that the defendants were there to hold the Embassy while such an agreement was brokered. *See, e.g.*, Rough PTC Hr'g Tr. at 83:3–17. Regardless of this connection, introduction of these desires for an international agreement would not help to negate the government's proof of *mens rea* or any other element of the government's case in chief. Further, diplomatic developments and international law are complex topics and their injection into the trial would risk confusing the jury. That risk is not substantially outweighed by any minute probative value of these topics. *See* FED. R. EVID. 403. The government's requests to exclude information about any protecting power agreement and about the Vienna Convention are thus granted.

## IV. CONCLUSION

The government's Motion *in Limine* to Limit Argument, Testimony and Evidence is granted as to the topics related to U.S. policy regarding the legitimacy of the Guaidó administration and defendants' views, *see* Gov't's MIL at 2–3, and as to the topics related to

---

actions," Defs.' Mot. to Compel at 5, inconsistent with the recognition of Guaidó and consistent with the recognition of Maduro, even after President Trump had formally recognized Guaidó as the leader, was denied, *see* Discovery Hr'g Tr. at 37:21–41:24.

actions taken prior to the timeframe charged in the information, *see* Gov't's MIL at 3.  The

government's motion is granted in part and denied in part as to the defenses identified in the

government's motion, as outlined *supra* Part III.B.

An appropriate Order accompanies this Memorandum Opinion.

Date:  February 4, 2020

_____
BERYL A. HOWELL
Chief Judge